1
2
3
4
5
6
7
8
9

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WARREN HOFFMAN and LONDELL HUEY,<br><br>                                    Plaintiffs,<br><br>v.<br><br>NEW FLYER OF AMERICA, INC.; KIDDE TECHNOLOGIES INC.; and DOES 1-25,<br><br>                                    Defendants. | Case No.:  22-cv-120-W-BLM<br><br>**ORDER GRANTING DEFENDANT KIDDE TECHNOLOGIES INC.'S MOTION FOR SUMMARY JUDGMENT [DOC. 32]** |

    Pending before the Court is Defendant Kidde Technologies Inc.'s ("Kidde") Motion for Summary Judgment Pursuant to Fed. R. Civ. P. 56 (the "Motion") [Doc. 32]. Defendant New Flyer of America Inc. ("New Flyer") joins the Motion and likewise moves for an order granting summary judgment in favor of New Flyer on the bases stated in the Motion.  (*Joinder of New Flyer of America Inc. in the Motion for Summary Judgment of Kidde Technologies Inc.* [Doc. 33] at 2.)  Plaintiffs Warren Hoffman and

1

1  Londell Huey oppose the Motion.  (*See Opposition to Motion for Summary Judgment*

2  [Doc. 41].)

3      The Court decides the matter on the papers submitted and without oral argument.

4  *See* Civ. R. 7.1(d)(1).  For the following reasons, the Court **GRANTS** Kidde's Motion

5  [Doc. 32].

6

7  **I.    FACTUAL BACKGROUND**

8      Kidde supplies automatic fire suppression and gas leak detection systems to

9  commercial bus manufacturers, who then incorporate them into their buses before

10 delivering them to the end user.  (*Joint Statement of Undisputed and Disputed Facts*

11 [Doc. 43], #1.)  Kidde supplied New Flyer of America, Inc. ("New Flyer") with gas leak

12 detection systems for a series of 2013 and 2015 Xcelsior XN60 buses that New Flyer sold

13 to MTS.  (*Id.*)  The Xcelsior XN60 is powered by compressed natural gas (unlike a

14 traditional diesel-powered transit bus).  (*Id.*, #3.)  The CNG is stored in eight tanks on the

15 roof of the bus—four on the section forward of the articulated joint and four on the rear

16 section.  (*Id.*)

17     On the morning of March 10, 2020, Plaintiff Huey was driving Bus 1106 on a

18 deadhead (with no passengers) to begin his route.  (*Id.*, #23.) While he was driving on the

19 freeway, he heard an alarm begin sounding over his head.  (*Id.*)  At the same time, the

20 lights on the bus were going on and off and the horn was honking. (*Id.*, #24.)  The display

21 screen for the gas detection system was turning red.  (*Id.*, #25.)  At some point after the

22 alarm activated, the engine shut down, but Mr. Huey was able to pull the bus over to the

23 side of the road, onto the shoulder. (*Id.*, #26.)  Mr. Huey then exited the bus. (*Id.*, # 27.)

24 He called MTS dispatch and told them that the alarm was going off.  (*Id.*)  MTS dispatch

25 told him to perform a battery reset. (*Id.*, #28.)  Mr. Huey performed the battery reset, but

26 it did not shut off the alarm.  (*Id.*)  After the alarm had been sounding for about 10-15

27 minutes, Mr. Huey went back onto the bus and was able to silence the alarm.  (*Id.*, #29.)

28 Mr. Huey radioed MTS dispatch, then checked the engine compartment at the rear of the

1  bus. (*Id.*, #30.)  Everything looked fine, so he started up the bus again. (Id.) The gas leak

2  detection system alarm did not activate again.  (*Id.*)  MTS dispatch told Mr. Huey to

3  continue his route.  (*Id.*, #31.)  He did, and when he returned to the UTC Transit Center, a

4  maintenance truck took Bus 1106 and Mr. Huey was given a standby bus.  (*Id.*)  When

5  MTS maintenance looked at the bus, they found a leak from exhaust from the turbo. (*See*

6  *Ex. 4 to Hoffman Decl.*, MTS Compacted Order [Doc. 32-6].)  MTS maintenance added a

7  new clamp and gasket.  (*Id.*)  When they road tested the bus, there were no leaks and it

8  was released for service.  (*Id.*)  Mr. Huey alleges that since the incident in March 2020,

9  he has experienced headaches and ringing in his ears.  (*Joint Statement of Undisputed*

10  *and Disputed Facts*, #37.)  In addition to non-economic damages, Mr. Huey seeks to

11  recover for medical expenses and loss of income. (*Id.*, #38.)

12        On the afternoon of September 24, 2020, Plaintiff Hoffman was assigned to drive

13  Bus 1306 on an MTS route from Old Town to College and University. (*Id.*, #44.)  The

14  route takes about 55 minutes to get from Old Town to College and University, then about

15  55 minutes to get back to Old Town.  (*Id.*)  According to Mr. Hoffman, when starting that

16  route, the alarm buzzer would sound "maybe once, twice, three times" when entering the

17  freeway because fuel would shift. (*Id.*, #45.)  MTS had "known that for years," but if a

18  driver called the radio room would say "It's just the fuel shifting. It's no big deal. Call us

19  if it does it again."  (*Id.*)  On the date of the incident, the gas detection alarm buzzer

20  sounded once or twice as Mr. Hoffman was getting on to 805, heading to Old Town. (*Id.*,

21  #46.)  But it stopped, similar to what Mr. Hoffman says he had observed before.  (*Id.*)

22  After Mr. Hoffman reached Old Town and loaded up his passengers, the gas detection

23  alarm buzzer began sounding again intermittently. (*Id.*, #47.)  As Mr. Hoffman proceeded

24  along the route, the buzzer would sound every time he hit a pothole or rough road.  (*Id.*)

25  When that happened, the buzzer would sound about six short beeps (or "blasts," as Mr.

26  Hoffman characterizes them).  (*Id.*)  Mr. Hoffman drove the bus for about one third of his

27  route in that condition before he called the MTS radio room and told them what was

28  happening.  (*Id.*, #48.)  The radio room asked him, "do you smell rotten eggs?"  (*Id.*)

When Mr. Hoffman said no, they instructed him to continue on his route—"do the best you can. We'll get you a new bus, or we'll send a truck to look at it." (*Id.*)  During Mr. Hoffman's break, he called the radio room again and asked them what he should do. (*Id.*, #49.)  The MTS radio room told him that they did not have a mechanic available, but they would try to get him a mechanic when the bus was back in Old Town.  (*Id.*) They told Mr. Hoffman to perform a battery reset to see if that would reset the alarm.  (*Id.*) Mr. Hoffman performed a battery reset, turned the bus off for a couple minutes, then started it back up.  (*Id.*, #50.)  According to Mr. Hoffman, the reset seemed to work for about five minutes as he was heading back to Old Town, but when he hit rough patches in the road, the buzzer began sounding intermittently again.  (*Id.*, #51.)  The buzzer went off 20 or 30 times as he drove back to Old Town.  (*Id.*)  Once in Old Town, MTS provided Mr. Hoffman with a replacement bus, and he had no further issues with the gas detection system.  (*Id.*, # 52.)  In total, Mr. Hoffman drove Bus 1306 for almost two hours with the gas leak detection system buzzer sounding intermittently.  (*Id.*, # 53.)  At no point in that time did Mr. Hoffman evacuate any of the passengers.  (*Id.*, #54.)  He did not attempt to pull over and shut off the engine as a result of the alarm.  (*Id.*, #55.)  According to Mr. Hoffman, that is because the buzzer would only sound a few times—"bam, bam, bam"— then go two or three minutes without sounding again.  (*Id.*, # 56.)  So MTS dispatch told him, "Keep going. Do the best you can."  (*Id.*)  Mr. Hoffman never pulled the bus over after the buzzer sounded because "it would only go off one or two times, and you didn't have to—it was no big deal."  (*Id.*, #57.)  He has no idea what color the gas detection system display panel was at any point during the incident.  (*Id.*, # 58.)  The lights and horn on Bus 1306 did not sound when the alarm activated, nor did the gas detection system shut down the bus.  (*Id.*, # 59.)  MTS maintenance ultimately found an issue with a flexible bar to which a fuel line was connected near the accordion joint.  (*Ex. 5 to Hoffman Decl.* [Doc. 32-7].)  After replacing a sensor nearby, MTS road tested the bus on a bumpy road without the alarm sounding.  (*Id.*)  Mr. Hoffman alleges ringing in his ears, headaches, sensitivity to light, "brain fog," and vertigo as a result of the incident with Bus

1306.  (*Joint Statement of Undisputed and Disputed Facts*, #65.)  He does not allege any hearing loss.  (*Id.*)

## II.   LEGAL STANDARD

Summary judgment is appropriate under Rule 56(c) where the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.  *See* FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A fact is material when, under the governing substantive law, it could affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997).  A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.

A party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.  The moving party can satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial.  *Id.* at 322-23.  "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment."  *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

"The district court may limit its review to the documents submitted for the purpose of summary judgment and those parts of the record specifically referenced therein."  *Carmen v. San Francisco Unified School Dist.*, 237 F.3d 1026, 1030 (9th Cir. 2001).  Therefore, the court is not obligated "to scour the record in search of a genuine issue of triable fact."  *Keenan v. Allen*, 91 F.3d 1275, 1279 (9th Cir. 1996) (citing *Richards v. Combined Ins. Co.*, 55 F.3d 247, 251 (7th Cir. 1995)).

22-cv-120-W-BLM

1      If the moving party meets its initial burden, the nonmoving party cannot defeat

2   summary judgment merely by demonstrating "that there is some metaphysical doubt as to

3   the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S.

4   574, 586 (1986); *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir.

5   1995) (citing *Anderson*, 477 U.S. at 252) ("The mere existence of a scintilla of evidence

6   in support of the nonmoving party's position is not sufficient.").  Rather, the nonmoving

7   party must "go beyond the pleadings and by her own affidavits, or by 'the depositions,

8   answers to interrogatories, and admissions on file,' designate 'specific facts showing that

9   there is a genuine issue for trial.'"  *Celotex*, 477 U.S. at 324 (quoting FED. R. CIV. P.

10  56(e)).

11     When making this determination, the court must view all inferences drawn from

12  the underlying facts in the light most favorable to the nonmoving party.  *See Matsushita*,

13  475 U.S. at 587.  "Credibility determinations, the weighing of evidence, and the drawing

14  of legitimate inferences from the facts are jury functions, not those of a judge, [when] he

15  [or she] is ruling on a motion for summary judgment."  *Anderson*, 477 U.S. at 255.

16

17  **III.    DISCUSSION**

18       **A.    Strict Product Liability**

19     Under California Saw, a manufacturer is held strictly liable for placing a defective

20  product on the market if the plaintiff's injury results from a reasonably foreseeable use of

21  the product.  *See Soule v. Gen. Motors Corp.*, 8 Cal.4th 548, 560 (1994).  A plaintiff may

22  seek recovery in a products liability case under strict liability in tort or on the theory of

23  negligence.  *Merrill v. Navegar*, Inc., 26 Cal.4th 465, 478 (2001).  "Products liability may

24  be premised upon a theory of design defect, manufacturing defect or failure to warn."

25  *Pannu v. Land Rover N. Am., Inc.*, 191 Cal.App.4th 1298, 1310 (2011).

26     A design defect may be established under either of two theories: (1) the consumer

27  expectations test, where a defect is established by showing that the product failed to

28  perform as safely as an ordinary consumer would expect when used in an intended and

22-cv-120-W-BLM

reasonably foreseeable manner; or (2) the risk/benefit test, where a defect is established by showing that the risks of danger inherent in the challenged design outweigh the benefits of the design. *Anderson v. Owens-Corning Fiberglas Corp.*, 53 Cal.3d 987 (1991). Under the consumer expectations test, "a product may be found defective in design if the plaintiff demonstrates that the product failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner." *Barker v. Lull Eng'g Co.*, 20 Cal.3d 413, 429 (1978). This test "does not require (or even permit) expert testimony." *Braverman v. BMW of N. Am.*, LLC, No. 21-55427, 2023 WL 2445684, at *2 (9th Cir. Mar. 10, 2023); *see also Soule v. Gen. Motors Corp.*, 8 Cal.4th 548, 567 (1994).

Kidde argues that the consumer expectations test cannot apply in this case. The consumer expectations test "is reserved for cases in which the *everyday experience* of the product's users permits a conclusion that the product's design violated *minimum* safety assumptions." *Soule*, 8 Cal.4th at 567. Importantly, as Plaintiffs point out, "the inherent complexity of the product itself is not controlling on the issue of whether the consumer expectations test applies[.]" *Saller v. Crown Cork & Seal Co., Inc.*, 187 Cal.App.4th 1220, 1231 (2010). Even a complex product "may perform so unsafely that the defect is apparent to the common reason, experience, and understanding of its ordinary consumers." *Soule*, 8 Cal.4th at 569. As such, a court must consider the "circumstances of the product's failure[.]" *Id.* at 568.

In *Soule*, an automobile collision resulted in the left front wheel of a car breaking free, collapsing rearward, and smashing floorboard into driver's feet. 8 Cal.4th at 570. The Supreme Court of California held that the consumer expectations test was inapplicable because "the ordinary consumer of an automobile simply has no idea how it should perform in all foreseeable situations, or how safe it should be made against all foreseeable hazards." *Id.* at 566-67 (internal quotations omitted). Following *Soule*, the California Court of Appeal, Second District, held that the consumer expectations test was inapplicable where an air bag deployed in a frontal collision with an on-coming car

1   because "[m]inimum safety standards for air bags are not within the common knowledge

2   of lay jurors." *Pruitt v. General Motors Corp.*, 72 Cal.App. 4th 1480, 1483 (1999).  And

3   in *Braverman*, the Ninth Circuit analyzed whether the consumer expectations test could

4   be applied to the operation of a small, gasoline-powered engine that engages to recharge

5   a car's electric battery when it runs low for the purpose of extending the range of the

6   vehicle.  2023 WL 2445684, at *1.  There, the plaintiffs sought to use the test to prove a

7   design defect where they "experienced deceleration when (1) driving at highway speeds,

8   (2) in extreme temperatures, or (3) when driving on steep uphill gradients." *Id.*  Taking

9   these circumstances into account, the Ninth Circuit held that the test was inapplicable

10  because "an ordinary consumer could not reasonably form an opinion about the safe

11  functioning" of the recharging system.  *Id.* at *2.

12          Here, the consumer expectations test cannot apply because this is not a case "in

13  which the *everyday experience* of the product's users permits a conclusion that the

14  product's design violated *minimum* safety assumptions." *Soule*, 8 Cal.4th at 567.

15  Plaintiffs' theory for both incidents is that the CNC leak detection alarm "sound[ed] off

16  randomly or inappropriately with no effective means to silence it[.]"  (*Opp.* at 13.)  This

17  theory requires examination of the precise operation of a complex safety device installed

18  in a bus, which requires analysis of: the precise operation of the alarm when the buses

19  turned sharply or hit a bump in the road, the detection of CNG in various parts of the bus,

20  and, in Mr. Huey's case, the appropriateness of the CNG alarm when there was a

21  "[l]eaking from exhaust from turbo" (*Ex. 4 to Hoffman Decl.*, MTS Compacted Order

22  [Doc. 32-6]) or, in Mr. Hoffman's case, an issue with a flexible bar to which a fuel line

23  was connected near an "accordion joint" (*Ex. 5 to Hoffman Decl.* [Doc. 32-7]).  The

24  incidents pose several questions whose answers are complex and not informed by the

25  "everyday experience" of an ordinary consumer.   Like the design defect theory in *Soule*,

26  Plaintiffs' design defect theory is "one of technical and mechanical detail." *Soule*, 8

27  Cal.4th at 570.

28

1

2     The circumstances of this case demonstrate that these incidents are much more

3   complex than the situations where the ordinary consumer test is appropriate.  *See Soule*, 8

4   Cal.4th at 566 n. 3 (listing automobiles that explode while idling at a stoplight or roll over

5   and catch fire in a two-mile-per-hour collision as situations where a jury could decide that

6   the car "failed to perform as safely as its ordinary consumers would expect").  Unlike the

7   examples from *Soule*, the incidents here are not situations in which a product performed

8   "so unsafely that the defect is apparent to the common reason, experience, and

9   understanding of its ordinary consumers."  *Soule*, 8 Cal.4th at 569.  If a car explodes

10  while sitting at a stoplight, an ordinary consumer could see that the car is defective.

11  Contrarily, under the circumstances here, the CNG systems did not perform so unsafely

12  that an ordinary customer could decide if the CNG systems were defective.  An ordinary

13  consumer could not reasonably form an opinion about the "safe functioning" of the CNG

14  leak detection system—i.e., what the system detects, when the alarm should sound, and

15  how loud the alarm should be—under the circumstances of this case.  *See Braverman*,

16  2023 WL 2445684, at *2.  The consumer expectations test is therefore unavailable to

17  Plaintiffs.

18     Plaintiffs have offered no other applicable theory of recovery that would allow

19  them to survive summary judgment without an expert opining as to design defect.  (*See*

20  *Opp.* at 11-14.)  And Plaintiffs have not provided any expert testimony on design defect.

21  Thus, Plaintiffs have failed to satisfy their evidentiary burden to establish the existence of

22  a design defect, which is fatal to their strict liability claim.   The Court therefore

23  **GRANTS** summary judgment on Plaintiffs' strict liability cause of action as to

24  Defendants Kidde and New Flyer.

25     **B.     Breach of Implied Warranties of Quality and Fitness**

26     Though it is not plead as a separate cause of action, Plaintiffs' Second Amended

27  Complaint alleges that "Defendants breach implied warranties of quality and fitness[.]"

28  (*SAC* ¶ 28.)  "Unless excluded or modified [ ], a warranty that goods shall be

merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." CAL.COMM. CODE § 2314(1). Thus, a defendant's "liability for an implied warranty does not depend upon any specific conduct or promise on their part, but instead turns upon whether their product is merchantable under the code." *Hauter v. Zogarts*, 14 Cal.3d 104, 117 (1975). The California Commercial Code does not "impose a general requirement that goods precisely fulfill the expectation of the buyer. Instead, it provides for a minimum level of quality." *Id.* A plaintiff who claims a breach of the implied warranty of merchantability must show that the product "did not possess even the most basic degree of fitness for ordinary use." *Mocek v. Alfa Leisure, Inc.*, 114 Cal.App.4th 402, 406 (2003) (citing CAL.COMM. CODE § 2314(2)).

In cases involving personal injuries resulting from allegedly defective products, "the theory of strict liability in tort has virtually superseded the concept of implied warranties." *Grinnell v. Charles Pfizer & Co.*, 274 Cal.App. 2d 424, 432 (1969). As a result, the Court's determination that Plaintiffs have not met their evidentiary burden on the strict liability claim requires that summary judgment be granted on Plaintiffs implied warranty claims as well. Plaintiffs have failed to put forth any evidence that the CNG leak detection systems were not fit for ordinary use. Even if Plaintiffs had proffered such evidence, they have not shown that they were in privity of contract with Defendants, which is required to succeed on a breach of warranty claim. *Blanco v. Baxter Healthcare Corp.*, 158 Cal.App.4th 1039, 1058 (2008) ("Privity of contract is a pre-requisite in California for recovery on a theory of breach of implied warranties of fitness and merchantability."). Plaintiffs therefore have failed to raise triable issues of fact regarding the breach of implied warranty claim. Accordingly, the Court **GRANTS** summary judgment on this cause of action.

C.    **Negligence**

Plaintiffs other cause of action is for negligent failure to recall and warn. (*SAC* ¶ 37.) "Whether alleged as a strict liability claim or a negligence claim, a plaintiff must first establish the existence of a defective design." *Demara v. The Raymond Corp.*, 13

1   Cal.App. 5th 545, 557 (2017).  "To establish the existence or nonexistence of a defective

2   design, the parties must proceed under the consumer expectation test, the risk-benefit test,

3   or both."  *Id.*; *see also Barker*, 20 Cal.3d at 426-27.  As explained above, the consumer

4   expectation test is not available to Plaintiffs in this case and Plaintiffs have not proffered

5   expert testimony, which is required to satisfy the risk-benefit test.

6        Even if Plaintiffs had proffered evidence to prove a defect, this claim would fail for

7   additional reasons.  "Negligence law in a failure-to-warn case requires a plaintiff to prove

8   that a manufacturer or distributor did not warn of a particular risk for reasons which fell

9   below the acceptable standard of care, i.e., what a reasonably prudent manufacturer

10  would have known and warned about."  *Anderson v. Owens-Corning Fiberglass Corp.*,

11  53 Cal.3d 987 1002 (1991).  Plaintiffs have not produced any evidence that Kidde was

12  aware of any defect that would require a warning before the subject incidents.  (*See Opp.*

13  at 14-15.)  Without such evidence, Plaintiffs cannot prove a claim for negligent failure to

14  warn.

15       For a negligent failure to recall claim, a plaintiff must prove: (1) that the defendant

16  manufactured the product; (2) that the defendant knew or reasonably should have known

17  that the product was dangerous or was likely to be dangerous when used in a reasonably

18  foreseeable manner; (3) that the defendant became aware of this defect after the product

19  was sold; (4) that the defendant failed to recall/retrofit or warn of the danger of the

20  product; (5) that a reasonable manufacturer under the same or similar circumstances

21  would have recalled/retrofitted the product; (6) that the plaintiff was harmed; and (7) that

22  the defendant's failure to recall/retrofit the product was a substantial factor in causing the

23  plaintiff's harm.  *See* California Jury Instruction, CACI 1223.  Even if Plaintiffs had

24  proffered evidence to prove a defect, Plaintiffs could not prove a negligent failure to

25  recall claim. Plaintiffs have failed to put forth any evidence to satisfy elements two or

26  three.  Even drawing all reasonable inferences in Plaintiffs' favor, the record does not

27  support an inference that Kidde knew that the CNG system was dangerous or was aware

28  of any alleged defect.  (*See Opp.* at 14-15.)

22-cv-120-W-BLM

1       For the reasons stated above, the motion for summary judgment on Plaintiffs'

2  negligence cause of action is **GRANTED**.

3

4  **IV.**    **CONCLUSION & ORDER**

5       For the reasons stated above, the Court **GRANTS** Kidde's motion for summary

6  judgment [Doc. 32].   Plaintiffs' strict liability, implied warranty, and negligence causes

7  of action against Kidde and New Flyer are **DISMISSED**.

8       **IT IS SO ORDERED.**

9

10  Dated:  September 7, 2023

11

12

13                  Hon. Thomas J. Whelan

14                  United States District Judge

15

16

17

18

19

20

21

22

23

24

25

26

27

28